STATE OF MAINE                                    SUPERIOR COURT
PENOBSCOT, SS.                                    Docket No. RE-08-80
                                                  A M M  · P! N - 2/ ' · ' ·

BARBARA GUAY, ET. AL.,          )
                Plaintiff,      )
                                )
                                )
                                )
        v.                      )        **JUDGMENT**
                                )
                                )
                                )
ALLEN KENNEDY, ET. AL.,         )
                Defendant.      )


This matter came before the Court for hearing on February 15, 2011. Plaintiff was present and was represented by Attorney Munch. Defendants were present and were represented by Attorney Chaiken.

On August 14, 2008 Plaintiff filed an eight count complaint. Counts six, seven and eight were dismissed prior to trial. The parties also presented a Joint Stipulation that was accepted by the Court.

The essence of this dispute surrounds a camp and land on Pushaw Lake in Glenburn, Maine and a sum of money that passed hands back in the 1960s. Plaintiff has alleged, on various theories, that she is entitled to a one-half interest in the property in Glenburn, Maine. Defendants have not filed a claim with respect to the sum of money that passed hands, but have asked for a set-off for that money.


## FACTUAL BACKGROUND

Richard Guay, the deceased husband of Barbara Guay, and Gloria Kennedy were brother and sister. In the 1950s and 1960s the Guay and Kennedy families were very close. Richard Guay and Allen Kennedy met in high school and became "like brothers". Richard Guay and Allen Kennedy intended to purchase land and build a camp. However, in 1962 before they did so, Richard Guay found a camp on Pushaw Lake with 50 acres of land. Mr. Guay and Mr. Kennedy discussed buying this property with the camp instead of building a camp, and decided to do so. Mr. Kennedy made a $500.00 down payment, and they approached the manager of the local bank to secure a loan for the remaining $4,500.00 of the $5,000.00 purchase price. While Mr. Guay and Mr. Kennedy intended to take the loan out together, based on the bank manager's direction, the loan was ultimately extended to Allen Kennedy alone. Thus, the deed was put in Allen Kennedy's name alone.

Mr. Kennedy and Mr. Guay worked together and cut wood on the camp property and perhaps on another piece of property owned by Mr. Kennedy, and Mr. Kennedy's

1

$500.00 down payment was returned to him. Mr. Kennedy remains fully satisfied that his $500.00 down payment was recouped.

The Guays and the Kennedys each paid one-half of the mortgage payment on a monthly basis, and the loan was paid in five years. The taxes and insurance were paid equally by the parties between 1962 and 2005. The Kennedys sent their ½ of the mortgage payment, ½ of the taxes and ½ of the insurance to the Guays, and Mrs. Guay added the Guays one-half and made the necessary payments. The parties also shared in the maintenance and improvements on a basis that was acceptable to both families. The Guays used the camp extensively over the years, and the Kennedys only visited the camp on occasion. Mr. Kennedy viewed the property as more of an investment and the Guays viewed the property more as a place for recreation. The Guays' extensive use of the camp did not concern the Kennedys.

In 1985 the Guays had a lawyer draw a proposed deed to the property, and this deed was left at Richard Guay and Gloria Kennedy's parents' house and Gloria Kennedy took the proposed deed back to Rhode Island with her and gave it to Allen Kennedy. If signed, the proposed deed would have titled the property in the names of Allen Kennedy, Gloria Kennedy, Richard Guay and Barbara Guay. Allen Kennedy did not sign the deed, nor did he state that he would not sign the deed. Remarkably there was no discussion between the Guays and the Kennedys at that time about having the deed signed.

At all times, including to the present, Allen Kennedy has agreed that he and Mr. Guay intended that they both, along with their wives, would own the camp property.

Sometime in 1962 or 1963, between the time the camp was purchased in 1962 and the time the Kennedys moved to Rhode Island in August of 1963, Allen Kennedy gave Barbara Guay $3,000.00 to invest for him in an employee-investment plan at Beneficial. Mrs. Guay approached Mr. Kennedy about this employee investment plan at Beneficial, the company where she worked. The money was to be invested in the name of Barbara Guay because Mr. Kennedy was not a Beneficial employee. The terms that are remembered are that the interest rate would be 10% plus dividends, and the money would have to remain in the account for two years. Mr. Kennedy was never given any paperwork about the investment. What happened to the money remains a mystery. Mrs. Guay does not clearly remember[1]. She testified during the trial that she "returned" the money to Beneficial, in 2005/2006 she told Mr. Kennedy that she would check with Beneficial about the money, and later in 2006 she told Mr. Kennedy, in the presence of Mr. Guay, that "she didn't remember" what she did with the money. It is clear that the Kennedys wonder if the money was used for something other than the investment. Mr. Kennedy was never given the investment proceeds or the return of his money. Within a few days of the first conversation about the "investment", Mrs. Guay told Mr. Kennedy that he could never tell Mr. Guay about the money. Mr. Kennedy was surprised that Mr. Guay did not already know, and he tried to back out. However, Mrs. Guay said it was too late as the money was tied up for two years. The Court is satisfied that this money changed hands and that Mrs. Guay secured a promise from Mr. Kennedy that he

---

[1] While the Court finds Mrs. Guay competent to testify, it is clear that she is struggling with memory issues and her testimony was quite confusing at times.

2

would not mention the money to Richard Guay. This issue festered with the Kennedys for years, but remarkably there was very little discussion between Mrs. Guay and the Kennedys (and no communication between the Kennedys and Mr. Guay) about the issue until years later.[2]


ANALYSIS

*Promissory Estoppel and Set off – Count 2*

The Restatement (second) of Contracts §90 (1981) provides:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee... and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

See *June Roberts Agency, Inc. v. Venture Properties*, 676 A. 2d 46 (Me. 1996). Promises to convey an interest in real property may be enforced under the principles of promissory estoppel. See *Tozier v. Tozier*, 437 A. 2d 645 (Me. 1981) (promisee made substantial improvements to land in reliance on promise that the land would be conveyed to him).

Based on equitable principles, Mr. Kennedy's promise to convey a one-half interest in the camp property is enforceable. Mr. Kennedy agrees that he made this promise. The parties purchased the camp property together, the Kennedys paid one-half of the taxes and insurance for 40+ years, the Guays paid one-half of the taxes and insurance for 40+years, in purchasing the camp and paying the taxes and insurance the Guays reasonably relied on Mr. Kennedy's initial promise to convey a one-half interest in the property to them, and the parties conducted themselves as equal owners for 40+ years. To this day, Mr. Kennedy agrees that there would be no issue with the Guays' one-half interest in the camp, but for the transfer of $3,000.00 between Mr. Kennedy and Mrs. Guay sometime in the 1960s[3].

Under principles of equity, the Court finds it fair that Mr. Kennedy receive credit in some way for a return of his $3,000.00 "investment". See *Nappi v. Nappi Distributors*, 1997 ME 54 (plaintiff's debt offset against debt owed by defendant to plaintiff). Sometime within a year or so after the camp property was purchased, Mr. Kennedy transferred $3,000.00 to Mrs. Guay for Mrs. Guay to invest for him in her employer's

---

[2] The only mention of the $3,000.00 between Mr. Kennedy and Mrs. Guay was once in 1982 during a few second statement by Mrs. Guay to Mr. Kennedy at the Kennedys' 25th wedding anniversary party; once in 2005 or 2006 when Mr. Kennedy asked Mrs. Guay about the investment and she said she would check with Beneficial; and once in 2006 a short time before Richard Guay's death at Mr. Guay's bedside. The $3,000.00 issue came up from "time to time" between Mrs. Kennedy and Mrs. Guay, with Mrs. Guay telling Mrs. Kennedy that she would repay the money with inheritances from her uncle, then mother.

[3] There are no writings with respect to the $3,000.00 transfer. However, the Court considers it "equitable" to consider the $3,000.00 issue when considering whether, on equitable principles, the Guays should be awarded a one-half interest in the camp property.

3

investment plan. This agreement for Mr. Kennedy, not an employee of Beneficial, to make the "investment" in a Beneficial employee plan, began the downward spiral. Moreover, the Court is convinced that – for some reason - Mrs. Guay did not want Mr. Guay to know about the transaction. Mrs. Guay extracting this promise from Mr. Kennedy and Mr. Kennedy's decades long adherence to the agreement furthered the downward spiral. It may well be that a bit of honest communication years ago between the Guays and the Kennedys would have resolved this matter amicably. The eventual method by which the matter was made known to the "family" further complicated the problem and certainly did not foster resolution.

At one point, Mr. Kennedy testified that he did not link re-payment of the $3,000.00 to not signing a deed granting Mr. and Mrs. Guay a one-half interest in the camp property[4]. Conversely, Mr. Kennedy testified that when Mrs. Guay said something to him in 1982 linking the $3,000 and the camp deed, Mr. Kennedy thought that a one-half interest in the camp property would about equal the $3,000.00 investment made in 1962/1963. The Court does not find that Mrs. Guay made any agreement in 1982 that the $3,000.00 would be repaid through title to the camp or something similar, nor that she was able to bind Mr. Guay to this sort of "trade" in 1982. To the extent the Kennedys argue this few second statement constituted an agreement, the Court does not find it was an agreement.

Given this entire situation, all of the equitable considerations mentioned above, the lack of specificity about the "investment" and Mr. Kennedy's failure to demand payment at the end of the two year period during which he understood his money was committed, all suggest to the Court that the amount of the set-off should be equitably determined. While not bound by the average interest rate from 1965 to 2010, the Court has considered the annual interest rate over this 45 year period in determining an equitable set off.[5] Both Mrs. Guay and the Kennedys bear responsibility for this issue – Mrs. Guay should have re-paid the money and the Kennedys should not have sat in silence. There shall be a set off of $30,000.00.


## Counts One and Four

Count one alleges constructive trust. "A constructive trust may be imposed to do equity and to prevent unjust enrichment when title to property is acquired by fraud, duress, or undue influence, or is acquired or retained in violation of a fiduciary duty." *Baizley v Baizley*, 1999 ME 126 (quoting *Estate of Campbell, 1997 ME 212)* (constructive trust imposed on land given by grandmother to one grandson for the benefit of her other grandchildren) (constructive trust imposed to prevent unjust enrichment). See also *Cassidy v. Cassidy*, 2009 ME 105 (constructive trust imposed on property owned by defendant for benefit of her former in-laws) (fiduciary relationship found between former daughter-in-law and former mother and father-in-law).

---

[4] In light of his other testimony and all the circumstances in this case, the Court is not particularly convinced that the $3000.00 had nothing to do with not signing the deed.

[5] The average interest rate between 1965 and 2010 was approximately 6.2%. See *Federalreserve.gov.*. Simple interest over the 45 years would total approximately $10,000 and compound interest would be approximately $50,000.00.

In this case, a relationship of trust existed between the Kennedys and Guays by virtue of their familial relationship and their close personal relationship, and the Guays relied on this relationship of trust. "A constructive trust is 'appropriate' where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it." *Baizley*.

There is no doubt that the Kennedys and Guays agreed that the camp property would be owned by each couple equally. There is also no question that Mr. Kennedy has not conveyed a one-half interest in the property as required by the parol agreement. It would be unjust for the Kennedys to retain full title to the property to the exclusion of Mrs. Guay. However, the extent of the unjustness must be analyzed in light of both the camp property and the $3,000.00 investment set forth above. Therefore, a constructive trust is imposed on the camp property and Plaintiff is awarded a one-half interest in the camp property, minus a set-off of $30,000.00 as set forth above.

Count four alleges unjust enrichment. A claim for unjust enrichment requires that the plaintiff establish: a) that she conferred a benefit on the defendant; b) that the defendant had appreciation or knowledge of the benefit; and c) the defendant accepted or retained the benefit under circumstances that make it inequitable for the defendant to retain the benefit without payment of its value *June Roberts*. See also *Baizley* (constructive trust imposed to prevent unjust enrichment). The Guays conferred a benefit on the Kennedys by paying ½ of the purchase price and 40+ years of one-half of the taxes and insurance for the camp property; the Kennedys were aware of the ½ payments; and it would be inequitable for the Kennedys to retain the camp property in the Kennedy name alone. Therefore, and as an alternative to the other counts, a constructive trust is imposed on the camp property to prevent unjust enrichment to the same extent and with the same set-off as set forth above.


## Counts Three and Five

Count three of the Complaint alleges equitable estoppel. The Court is not convinced that "equitable estoppel" constitutes an independent claim for relief. See *Chase v. Southern Maine Economic Dev'p Dist.*, 2008 Me. Super. Lexis 47.

Count five of the Complaint alleges Fraudulent or Negligent Misrepresentation. The Court does not find that the Defendants engaged in fraud or negligent misrepresentation (any "misrepresentation" was through acquiescence and silence). There were no affirmative acts of fraud.


## Statue of Frauds

Maine's statute of frauds, 33 M.R.S.A. §51(4), provides that, absent special circumstances, the contract for the sale of land must be in writing. A transfer of real property without a written contract is enforceable only if the party seeking to enforce the agreement proves by clear and convincing evidence that an oral contract exists and that an exception to the statute of frauds applies. See *Sullivan v. Porter*, 2004 ME 134.

The part performance doctrine is one exception to the statute of frauds, and this doctrine requires proof that: 1) the parties entered into a contract, 2) the party seeking to enforce the agreement partially performed the contract, and 3) the performance was induced by the other party's misrepresentations, which may include acquiescence or silence. *Id.*

All parties agree that there was an agreement that the Kennedys and the Guays would own the camp property together. All parties also agree that they shared equally in paying for the property, and shared equally in paying the taxes and insurance from 1962 to 2005. The Guays' extensive use of the property over the years was with Mr. Kennedy's "blessing". The parties do not have disputes about the maintenance and repairs to the property. Thus, plaintiff has established the first two elements of the part performance exception to the statute of frauds by clear and convincing evidence. The third element of the part performance exception to the statute of frauds requires more discussion: was the Guays' payment of the mortgage, taxes, insurance and other expenses over the years and their labor over the years induced by the misrepresentation that they would be one-half owners of the property. The evidence in this case is that Mr. Kennedy intended to sign a one-half interest in the property over to Mr. and Mrs. Guay after the mortgage was paid. He continued to have that intent over the years, but did not get around to it. In 2005, at a time when Mr. Guay was in failing health, the Guays stopped contributing to the taxes and insurance after they came to believe that they could no longer use the camp. Mr. Kennedy testified that even as late as 2006, right before Mr. Guay died, he never said that he would not transfer a one-half interest in the camp to the Guays. However, in 2006, the Guays came to believe that Mr. Kennedy would not be signing a one-half interest in the camp over to them, and they took steps to have Mr. Guay's deposition taken, but he died before the deposition was taken.

The Court is satisfied by clear and convincing evidence that the Guays were induced to contribute to the payment for the camp and the taxes, insurance and other expenses for over forty years by the initial parol promise, followed by the acquiescence and silence of the Kennedys. The silence and acquiescence resulted in misrepresentations that induced the continued payments in faith that the promise would be performed.

Moreover and alternatively, a constructive trust arises or results by implication of law, therefore, an exception to the statute of frauds exists. See 33 M.R.S.A. §851. The statute of frauds does not apply to the constructive trust count. See *Baizley.*

Therefore, the Court does not find that the statute of frauds is an effective defense to plaintiff's claims.

## Statute of Limitations

The statute of limitations is an affirmative defense under M. R. Civ. P. 8(c), and was raised as an affirmative defense in this case.

The parties have not clearly specified what statute of limitation they believe applies to the various counts in this case[6]. Moreover, they have variously argued that the cause of action accrued in 1962, 1967, 1982 1985, 2003-2205 and 2005[7]. The property was purchased in 1962; the mortgage was paid in 1967; a proposed deed was given to the Kennedys in 1985, to which the Kennedys did not respond; Mrs. Guay made a few second comment to Mr. Kennedy about the camp in 1982; the Guays came to believe they could not continue to use the camp as they previously had in approximately 2003-2005; the Guays stopped paying taxes and insurance for the camp property in 2005; and the Kennedys and the Guays finally discussed the issue of title to the camp in 2006. The Court is satisfied that there was no repudiation of the agreement that Mr. Kennedy would sign over a one-half interest in the camp property to the Guays until at least 2003, if not later.

The party asserting statute of limitations as an affirmative defense has the burden of proof to establish that the cause of action accrued outside the time limits of the statute. See *Townsend v. Chute Chemical Co.*, 1997 ME 46. Because the Court is satisfied that the Kennedys are estopped from asserting the statute of limitations as an affirmative defense, the Court does not reach the question of what statute of limitation applies to the various different counts or when the statute began to run. See *Dugan v. Martel*, 588 A.2d 744 (Me. 1991) (estoppel may bar defendant from invoking a statute of limitations defense if defendant conducted himself in a manner that induced plaintiffs not to take timely action).

The camp property was purchased in 1962, and, after conversation with a bank manager, the mortgage and the title were in the name of Allen Kennedy alone. The mortgage was paid in 1967. A proposed deed was given to Mr. Kennedy in 1985. The proposed deed, if signed, would have titled the property to Richard and Barbara Guay and Allen and Gloria Kennedy. Mr. Kennedy did not take any action with respect to the 1985 proposed deed. There was no statement by Mr. Kennedy that he refused to sign the deed. In fact, Mr. Kennedy testified that he just didn't get around to signing it. Remarkably, there was simply no discussion about the proposed deed. The Guays did not raise the issue with the Kennedys and the Kennedys did not raise the issue with the Guays. Sometime in 2003 or so, the Kennedys' daughter asked the Guays if it would be okay if she left two cats at the property for awhile, and they agreed. This suggests to the Court that the Kennedys continued to consider the Guays as part-owners of the camp in 2003. The Guays continued to use the camp, almost exclusively as they always had, through sometime around 2003-2005. The Guays also continued to pay one-half of the taxes and insurance until 2005, as they always had. It was not until the Guays' son, and the Kennedys' daughter met at the camp sometime later in 2003/2004 that the

---

[6]   14 M.R.S.A. §801 provides: "No person shall commence any real or mixed action for the recovery of lands, or make an entry thereon, unless within 20 years after the right to do so first accrued, or unless within 20 years after he or those under whom he claims were seized or possessed of the premises, except as provided in this subchapter."

   14 M.R.S.A. §752 provides: "All civil actions shall be commenced within six years after the cause of action accrues and not afterwards..."

[7]  14 M.R.S.A. § 803 provides: "The right of entry or of action to recover land, as used in this subchapter, first accrues at the following times: 1. When disseized. When a person is disseized, at the time of such disseizin....."

14 M.R.S.A. § 804 provides: "Section 803 shall not prevent any person from entering, when so entitled by reason of any forfeiture or breach of condition; but if he claims under such a title, his right accrues when the forfeiture was incurred or the condition broken."

Guays came to believe that they could not use the camp as they had before. In 2005, the Guays stopped contributing to the taxes and insurance, again apparently without any discussion. In 2006, shortly before Mr. Guay's death, the issue about the camp deed and the $3,000.00 "investment" issue was finally discussed with Mr. Guay and at that point the Guays came to believe that Mr. Kennedy would not sign the deed (even though Mr. Kennedy maintains that even at that point he did not refuse to sign the deed).

The Guays contributed equally to the purchase price of the camp, and they contributed equally to the taxes and insurance between 1962 and 2005. The Guays relied on Mr. Kennedy's agreement that he would transfer title to ½ interest in the camp property over the 45+ years they tied up their initial investment in the camp and continued to contribute to the taxes, insurance and improvements. The Guays would not have contributed to the purchase price or contributed to insurance, taxes and improvements if they did not rely on the belief that Mr. Kennedy would keep his agreement. Once title to the camp property was finally discussed between the Kennedys and the Guays in 2006, it became apparent to the Guays that Mr. Kennedy would not be signing over one-half interest in the camp property to them, and they immediately took action to have Mr. Guays' deposition taken and filed a lawsuit two years later.

Mr. Guay and Mrs. Kennedy were brother and sister, and Mr. Guay and Mr. Kennedy were like brothers, particularly in the early years. Given their relationship and the long course of conduct regarding the use and expenses of the camp, the Guays reliance on Mr. Kennedy's promise was reasonable. Given the close relationship between the parties, the conduct of the parties, and the silence of Mr. Kennedy over the years between 1962 and 2006 about title to the property, the Court finds that Mr. Kennedy is equitably estopped from invoking the statute of limitations defense. See *Dugan* (in appropriate cases, estoppel may be applied to prevent a party from raising a statute of limitations defense).


## Laches

Defendants have also raised laches as an affirmative defense.

> Laches is negligence or omission seasonably to assert a right. It exists
> when the omission to assert the right has continued for an unreasonable
> and unexplained lapse of time, and under circumstances where the delay
> has been prejudicial to an adverse party, and where it would be
> inequitable to enforce the right.

*M.S.A.D. 27 v. Maine Public Employees' Retirement System*, 2009 ME 108, (quoting *Fisco v. Dept. of Human Services*, 659 A. 2d 275 (Me. 1995).

In this case, it is clear that the Guays and the Kennedys did not discuss the deed to the camp property from about 1962 to 2006, but for one few-second statement by Mrs. Guay to Mr. Kennedy in 1982. While the Guays did not assert their right over this period of time, Mr. Kennedy never refused to sign the deed, nor did he ever raise the issue. Both the Guays and the Kennedys continued to share the expenses of the camp until 2005, and the Guays continued to enjoy the

camp, almost exclusively from 1962 to approximately 2003. The passage of time is not unreasonable or unexplained in this case given the familial relationship, the continued sharing of taxes and insurance, the Guays continued use of the camp and the lack of any statement or action by the Kennedys demonstrating that the circumstances with respect to the camp had changed.

The Court is not satisfied that the delay has been prejudicial to the Kennedys. While Mr. Guay has died, the dispute in this case is limited. The Kennedys do not dispute there was a promise that the Guays and the Kennedys would own the camp together, and there is no credible evidence that Mr. Guay knew anything about the $3,000.00 issue until sometime in 2006.

For all these reasons, the Court does not find laches to bar Mrs. Guay's claim. The Court does not find any other affirmative defense bars Mrs. Guay's claims.

## Judgment

The Clerk shall enter this Judgment upon the docket as follows:

Judgment for Plaintiff on Count One. A constructive trust is imposed on the camp property, more fully described in a deed recorded in the Penobscot County Registry of Deeds Book 1858, Page 387, and Plaintiff is awarded a ½ interest in the camp property minus the $30,000.00 set off.

Judgment for Plaintiff on Count Two. Plaintiff is awarded a ½ interest in the camp property, minus the $30,000.00 set off.

Judgment for Defendant on Count Three

Judgment for Plaintiff on Count Four. A constructive trust is imposed on the camp property, more fully described in a deed recorded in the Penobscot County Registry of Deeds Book 1858, Page 387, and Plaintiff is awarded a ½ interest in the camp property minus the $30,000.00 set off.

Judgment for Defendant on Count Five.

Dated: February 24, 2011

Ann M. Murray
Justice, Maine Superior Court

Judgment entered upon the docket on 3/2/11.

9